NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 3

No. 23-AP-221

| | |
|---|---|
| Gail Haupt | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| | |
| John Langlois | November Term, 2023 |

Helen M. Toor, J.

William H. Sorrell, Burlington, for Plaintiff-Appellee.

Craig Weatherly, Burlington, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1.     **REIBER, C.J.**  Defendant John Langlois appeals the superior court's no-stalking order, which requires him to stay at least fifty feet away from plaintiff Gail Haupt and prohibits him from communicating with plaintiff, directing physical gestures at her, or entering her property. The trial court found that defendant engaged in two threatening acts as defined in 12 V.S.A. § 5131(1)(A), necessitating a no-stalking order under 12 V.S.A. § 5133(d). Defendant argues that the court erred in finding that the two altercations qualified as threats and in failing to consider whether his actions were justified in defense of personal property. We conclude that defendant's actions qualify as threats under the statute and that his common law defense is inapplicable in this context. Accordingly, we affirm the trial court's no-stalking order.

## I. Facts

¶ 2.     Plaintiff and defendant are neighbors, residing across from one another on a private road in Milton, Vermont.  Defendant owns a 10.2-acre parcel of land located along the eastern side of the road, while plaintiff and her family own several parcels of land to the west and north of defendant's property.  The private road is located entirely on plaintiff's property, but defendant holds an easement for ingress and egress.  Defendant asserts that the access road formed the western boundary of his property at the time he purchased it, but the road was later moved slightly west, leaving a small strip of land between the edge of the access road and the property.  The record shows that an earlier legal dispute between plaintiff and defendant arose when defendant made a claim of adverse possession over the narrow strip of land next to the access road.  Defendant claimed that he had maintained the land as his own property, but plaintiff contested his ownership. The parties eventually resolved the dispute in November 2020 with a mediation agreement, under which plaintiff agreed to maintain the grass on both sides of the access road up to the boundary line, and each party agreed not to trespass on or interfere with the other's property.

¶ 3.     The mediation agreement was not the end of the acrimony between the parties. Plaintiff testified that defendant has threatened her on various occasions, including one time when he slapped her in the face, knocking her cellphone out of her hand.  Defendant testified that plaintiff regularly drives a small ATV directly along their property line, at times honking the horn and shouting, which the trial court concluded she does "apparently just to annoy" defendant.  Each party has accused the other of repeatedly engaging in antagonistic acts like shouting, making obscene gestures, and taking surreptitious photographs.

¶ 4.     The record and the parties' briefs show that the current incident arose as follows. Defendant owns several arborvitae trees, one of which is planted on his property but encroaches somewhat onto plaintiff's property.  Plaintiff has allegedly damaged the tree on several occasions by driving her ATV into it, cutting branches, and cutting a mesh fence that defendant installed to

protect the tree. In response, defendant added several metal stakes across the body of the tree, which support the mesh fence but stick out a few inches further onto plaintiff's property.

¶ 5. On April 16, 2023, plaintiff drove past the tree and observed the stakes sticking out onto her property. She took out the stakes and tossed them across the property line. The following day, plaintiff again approached the tree and, observing that the stakes had been placed back in the tree, again removed them. Seeing plaintiff take out the stakes, defendant approached. The subsequent altercation was captured on a security camera placed by plaintiff's son-in-law. From the parties' testimony and the footage, the trial court concluded that defendant shook and grabbed plaintiff while "screaming at her in an enraged manner with profanity-laced language."

¶ 6. On April 19, 2023, plaintiff filed a complaint for an order against stalking with the superior court. First, she alleged that defendant had placed the stakes in the tree sticking out onto her property with the intent to hurt her or her family. And second, she alleged that defendant grabbed and shook her after she attempted to remove the stakes. She requested an emergency order, alleging that these incidents had left her physically hurt, unable to sleep, and afraid to leave her home. The trial court granted the temporary order and set the case for hearing.

¶ 7. After two hearings, held on May 18 and 24, the trial court issued an order finding that defendant had committed two threatening acts, constituting stalking under 12 V.S.A. § 5331. The court first rejected plaintiff's claim that the placement of the stakes amounted to a threat. The court found that the stakes stuck out only a couple of inches and were not placed in a location that would injure anyone walking or driving nearby. Second, the court found that the April 17 altercation constituted a threat, concluding that "regardless of why" defendant attacked plaintiff, "[a]n actual physical assault certainly constitutes a threat under the statute." The court also concluded that plaintiff's testimony about defendant previously slapping her and knocking her cellphone out of her hand also demonstrated a threat under the statute. While the slapping incident was not included in plaintiff's complaint, the court found that the testimony at trial was credible

3

and unrebutted. Finally, the court found that defendant had to know that a reasonable person would fear for their safety as a result of the two incidents. Therefore, it concluded that plaintiff was entitled to a no-stalking order. Defendant appealed the order to this Court.

## II. Discussion

¶ 8. Under Vermont's civil stalking statute, a court must impose a no-stalking order if it "finds by a preponderance of evidence that the defendant has stalked" the plaintiff. 12 V.S.A. § 5133(d). The chapter defines "stalk" as "to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person" to either fear for their safety or suffer substantial emotional distress. Id. § 5131(6). The chapter, in turn, defines "course of conduct" as "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person, or interferes with another person's property." Id. § 5131(1). This definition applies to acts performed either "directly or indirectly, and by any action, method, device, or means," but does not include constitutionally protected activity. Id.

¶ 9. In reviewing the trial court's no-stalking order, we will "uphold its findings if supported by the evidence and its conclusions if supported by the findings." Beatty v. Keough, 2022 VT 41, ¶ 6, __ Vt. __, 287 A.3d 54 (quotation omitted). We leave it to the trial court to "assess the credibility of witnesses and weigh the evidence." Id. However, we review the trial court's legal conclusions de novo. Morton v. Young, 2023 VT 29, ¶ 10, __ Vt. __, 298 A.3d 230.

¶ 10. In challenging the no-stalking order, defendant makes two main arguments. First, he argues that the trial court erred in concluding that his two acts of physical violence constituted threats under the statute. Second, he argues that the trial court failed to consider his contention that his actions were privileged as being in defense of personal property. We consider each of these arguments in turn.

4

A.

¶ 11.    Defendant first argues that the court erred in concluding that actual physical violence constitutes an act of stalking under the statute.  He points out that the civil stalking statute "says nothing about physical injury," and asserts that since our precedents require us to "construe the civil stalking statute narrowly," Hinkson v. Stevens, 2020 VT 69, ¶ 25, 213 Vt. 32, 239 A.3d 212, we cannot interpret the statute to apply to acts it does not explicitly mention.  Defendant further notes that we have previously defined "threat" as "a communicated intent to inflict physical harm on another person," id. ¶ 46, and argues that the altercations here were not threats because there "is no evidence that he ever expressed an intent to harm [plaintiff] physically."

¶ 12.    While defendant is correct that our precedents require us to construe the language of § 5131 narrowly, even a narrow reading of the statute permits an interpretation that an act of physical violence can constitute a threat.  The statute states that the term "threaten shall not be construed to require an express or overt threat."  12 V.S.A. § 5131(1)(B).  Instead, threats may be "conducted by the person directly or indirectly, and by any action, method, device, or means."  Id. § 5131(1)(A).

¶ 13.    A threat need not be communicated in words.  We have previously stated in the context of our criminal disorderly conduct statute that "behavior is threatening when it communicates a threat."  State v. Schenk, 2018 VT 45, ¶ 11, 207 Vt. 423, 190 A.3d 820; see also Black's Law Dictionary (11th ed. 2019) (defining "communication" as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct" (emphasis added)).  We have also previously held that a physical act by itself can communicate a threat; in State v. Cole, we held that a jury could find that the defendant had grabbed a flashlight from a police officer in order to use it as a weapon, and therefore that "the act of grabbing the flashlight could be found to be

5

threatening behavior, done to communicate the intent to harm."[1]  150 Vt. 453, 456-57, 554 A.2d 253, 255 (1988).  Other courts have reached similar conclusions.  See, e.g., State v. Pinkney, 411 P.3d 406, 410 (Wash. Ct. App. 2018) (concluding that plain meaning of "threaten" in harassment statute included nonverbal threats and that "[c]lenching one's fist in another person's face and growling conveys to a reasonable person the intention to cause bodily harm to that person"); N.Y. ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) ("That nonverbal conduct may communicate a true threat is beyond question.").

¶ 14.  Defendant's actions here constituted a threat because they communicated an intent to inflict physical harm on plaintiff.  While defendant asserts that he did not have the intent to threaten plaintiff, his two acts of physical violence show otherwise.  The trial court here found that defendant slapped plaintiff in the face on one occasion and grabbed and shook her while screaming profanities on another.  Defendant does not assert that these violent acts were not intentional, only that he did not intend to communicate a threat.  As we have previously said, in evaluating whether a defendant has made a threat, the relevant question is "whether an ordinary, reasonable person familiar with the context of the communication would interpret it as a threat of injury."  State v. Noll, 2018 VT 106, ¶ 37, 208 Vt. 474, 199 A.3d 1054 (quotation omitted); see also Counterman v. Colorado, 600 U.S. 66, 74 (2023) ("The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." (quotation omitted)).  Further, the intent necessary for a threat "must be inferred from a person's acts and proved by circumstantial evidence."  Cole, 150 Vt. at 456, 554 A.2d at 255.  By using violence against plaintiff on two occasions, defendant conveyed a message that he was willing and able to inflict

---

[1]  While Cole interpreted the disorderly conduct statute rather than the stalking statute, our definition of "threat" in both contexts is virtually identical.  Compare Cole, 150 Vt. at 456, 554 A.2d at 255 ("A threat is a communicated intent to inflict harm on person or property."), with Hinkson, 2020 VT 69, ¶¶ 45-46 (defining "threaten" as "a communicated intent to inflict physical harm on another person" and describing this definition as "consistent with our previous interpretations of the term 'threat' ").

6

physical harm to get what he wants. Regardless of whether he subjectively intended to threaten plaintiff, he communicated an intent to harm her. He therefore threatened plaintiff within the meaning of § 5131.

¶ 15. Holding that defendant's actions here were not threats would lead to absurd results. If instead of making physical contact with plaintiff during the first altercation, defendant had merely raised his hand and feigned a slap, there would be no question that he was threatening to inflict physical harm on plaintiff. The same would be true if defendant had screamed profanities in plaintiff's face and gestured as if to grab and shake her, but stopped short of actually doing so. The fact that defendant followed through with two acts of physical violence does not alter this conclusion, but rather strengthens it. See State v. Lacey, 968 N.W.2d 792, 805 (Iowa 2021) (noting in context of criminal harassment statute that while "[p]hysical violence is not a required element" of the crime, it "is powerful evidence here that [defendant] intended to threaten" victim).

¶ 16. Our interpretation of the statute as applying to acts of physical violence is also consistent with the statute's purpose of interrupting the cycle of violence that accompanies stalking. The legislative findings related to the civil stalking statute indicate that "[s]talking conduct often becomes increasingly violent over time." 2015, No. 162 (Adj. Sess.), § 1. The civil stalking statute allows courts to issue protective orders because of the recognition that stalking "conduct may mature into further incidents of abuse or stalking." Swett v. Gates, 2023 VT 26, ¶ 28, __ Vt. __, 297 A.3d 944 (quotation omitted); cf. Raynes v. Rogers, 2008 VT 52, ¶ 8, 183 Vt. 513, 955 A.2d 1135 (noting that the analogous relief-from-abuse statute[2] is "aimed at ending the cycle of domestic violence before it escalates"). This escalating cycle of violence is precisely what has occurred here; what began as a dispute over property has escalated to verbal and now physical

---

[2] For discussion of how the civil stalking and relief-from-abuse statutes are analogous, see infra, ¶ 18.

altercations. After the most recent incident, plaintiff sought medical attention[3] and testified that she fears for her safety—particularly the possibility that "next time, it's going to be a gun." A holding that the stalking statute cannot provide relief simply because the altercations have already become physical would be contrary to the remedial purpose of the statute. We therefore conclude that defendant's conduct here qualifies as a threat within the meaning of 12 V.S.A. § 5131(1), and that the trial court did not err in issuing the no-stalking order based on the two altercations.

B.

¶ 17. Defendant next argues that the court erred by concluding that the April 17 incident constituted stalking "regardless of why he did it." He points out that the stalking statute does not apply to "[c]onstitutionally protected activity," 12 V.S.A. § 5131(1)(A), and argues that his actions were privileged as being in defense of personal property—the metal stakes. He contends that by finding that the attack was a threat without considering why he acted that way, the court expanded the reach of the statute beyond its intended scope.

¶ 18. We have previously rejected the applicability of the common law defense-of-property doctrine to our relief-from-abuse statute, 15 V.S.A. § 1103. See Raynes, 2008 VT 52, ¶ 14. In Raynes, we noted that defense of property "historically arose in the context of common-law criminal and tort actions," and was meant to "reinforce[] the importance of citizens' private property rights by exempting property owners from liability for protecting their property." Id. ¶ 12. But, we held, because abuse prevention orders are based entirely in statute rather than the common law, the common law defense was inapplicable in that context. "Whereas it makes sense to allow common-law defenses to crimes and torts that derive from the common law, the policies

---

[3] The trial court made no findings about plaintiff's injuries, but admitted her medical records for the sole purpose of showing that she sought out medical treatment. The records show plaintiff reported pain in her left shoulder and left foot. Plaintiff also submitted photographs showing bruising on her arms.

underpinning the abuse-prevention statute, and the protections offered by it, represent a stark departure" from the common law. Id. ¶ 13.

¶ 19. In previous cases, we have often referenced the relief-from-abuse statute to aid in interpreting the stalking statute, and vice versa. See, e.g., Swett, 2023 Vt 26, ¶ 31 ("Like the stalking statute, a plaintiff need not prove additional acts of abuse or violations during the term of an RFA order to secure an extension . . . ." (quotation omitted)); T.C. v. L.D., 2020 VT 19, ¶ 10, 211 Vt. 582, 229 A.3d 77 ("The related provision for RFA orders, 15 V.S.A. § 1103(a), also contains no age limitation on who may be the subject of an RFA order."). These comparisons are appropriate because the stalking statute is incorporated by reference as part of the relief-from-abuse statute. See 15 V.S.A. § 1101(1) (" 'Abuse' means the occurrence of one or more of the following acts between family or household members . . . (D) Stalking as defined in 12 V.S.A. § 5131(6)."). Further, "the purposes of the stalking statute and the RFA statute are aligned; both concern themselves with threatening or violent behavior." State v. Waters, 2013 VT 109, ¶ 28, 195 Vt. 233, 87 A.3d 512.

¶ 20. Given the similarities between the statutes, we conclude that the logic of Raynes is equally applicable to the stalking statute. As with the relief-from-abuse statute, the civil stalking statute has no common-law antecedent. See Aily Shimizu, Domestic Violence in the Digital Age: Towards the Creation of a Comprehensive Cyberstalking Statute, 28 Berkeley J. Gender L. & Just. 116, 128 (2013) ("Stalking as a tort has been an exclusively statutory creation as courts have been reluctant to extend common law to create a separate civil action for stalking."). Because the civil stalking statute is not derived from a common law tort, there is no basis for importing common law defenses. See Raynes, 2008 VT 52, ¶ 13. Additionally, the primary reason for the existence of the defense-of-property privilege—protecting "private property rights by exempting property owners from liability for protecting their property," id. ¶ 12—is inapplicable to the civil stalking

9

statute, since findings in a stalking order are inadmissible "in any subsequent civil proceedings for the purpose of establishing liability." 12 V.S.A. § 5133(l).

¶ 21.    Further, like the relief-from-abuse statute, the civil stalking statute is "remedial in nature" and is solely focused on "the plaintiff's need for immediate and prospective protection from the defendant rather than the defendant's liability." Raynes, 2008 VT 52, ¶ 13.  The civil stalking statute grants courts the same authority to issue protective orders as the relief-from-abuse statute.  Compare 12 V.S.A. § 5133(d) (permitting the court to "make any other order it deems necessary to protect the plaintiff or the plaintiff's children, or both" based on a finding that the defendant has engaged in stalking), with 15 V.S.A. § 1103(c)(1) ("The court shall make such orders as it deems necessary to protect the plaintiff or the children, or both, if the court finds that the defendant has abused the plaintiff . . . .").  The legislative findings related to the stalking statute also confirm that the purpose of the statute is not to punish defendants, but to protect individuals from "severe intrusions on . . . personal privacy and autonomy" and to limit "risks to the security and safety" of the individual.  2015, No. 162 (Adj. Sess.), § 1.  As we noted in Raynes, the "critical question in such proceedings . . . is not who was at fault, but who, if anyone, is in need of protection."  Raynes, 2008 VT 52, ¶ 13 (emphasis in original).  In these circumstances, the common law defense-of-property privilege is "wholly irrelevant." Id. ¶ 14.

¶ 22.    Thus, following Raynes, we hold that the common law defense-of-property privilege is not a defense to a civil stalking order.[4]  Accordingly, we conclude that defendant's actions were not privileged and that the court did not err in failing to consider defendant's defense-of-property argument.  As previously discussed, we also hold that defendant's acts of physical

---

[4] While we reject the applicability of the defense-of-property privilege as a discrete defense to a civil stalking order, we note the possibility that such evidence could still be relevant for other purposes.

10

violence amount to threats under 12 V.S.A. § 5131.  We therefore conclude that the court did not err in imposing a no-stalking order.

     <u>Affirmed</u>.

                              FOR THE COURT:


_____
Chief Justice